UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHRYN ROHDE,

      PLAINTIFF,

   vs.

UNITARIAN UNIVERSALIST
ASSOCIATION, UNITARIAN
SERVICE PENSION SOCIETY, AND
SARAH LAMMERT,

      DEFENDANTS.

Civil Case No. 23-cv-05047

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

### I.  INTRODUCTION

After more than 40 years of service to the Unitarian Universalist ("UU") church, Plaintiff Rev. Kathryn Rohde was swept up in an ideological purge that led the elderly, disabled, and long-retired minister to not only lose her ministerial credentials, but also to be publicly defamed by UU leadership and retroactively stripped of a pension she received for her years of service to the church. Defendants now ask this Court to dismiss Plaintiff's claims in their entirety, arguing that their status as a religious organization gives them the unassailable right to defame Rohde and retroactively strip her of her pension in violation of their contractual obligations. For the reasons that follow, this Court should deny Defendants' motion.

### II.  FACTUAL BACKGROUND

Plaintiff, Rev. Kathryn Rohde, was a trailblazing female Unitarian Universalist minister. Despite the hurdles facing female ministers in the early years — Plaintiff was both the victim of sexual harassment by male colleagues and a counselor and advocate for those healing from sexual abuse in the UU community — she helped thousands of people over the course of her

1

career in the UU church. She has long been active in the areas of racial justice, feminism, gay rights, poverty, education, and immigration and has been awarded multiple prizes for her work, including the Skinner Prize and the Interweaver Prize. (ECF No. 1 at ¶¶ 22-23).

After a long and distinguished career, Plaintiff retired in 2014, remaining an emeritus minister at the Unitarian Congregation of West Chester, where she had served for 17 years. (*Id.* at ¶ 28). As a retired minister, Plaintiff was eligible to receive a stipend available to all retired UU ministers who have reached the age of 66 and served at least 20 years in Unitarian Universalist ministries — both of which she had done. (*Id.* at ¶ 122). Upon her retirement in 2014, Plaintiff applied for her pension and elected to receive a smaller stipend (approximately $1800 annually) that included a survivor benefit for her husband if she predeceased him. Plaintiff chose this over a larger stipend that did not provide this survivor benefit. (*Id.* at ¶¶ 124-125).

Plaintiff's ministry always reflected a deep commitment to the values of freedom of belief and expression — values to which the UU church presents itself, on paper, as deeply committed. The Unitarian Universalist Association ("UUA") bylaws specify that ministers are *not* "required to subscribe to any particular creed, belief, or interpretation of religion," (*Id.* at ¶ 31), and the guidelines to those bylaws state that "The minister(s) shall have freedom of the pulpit as well as freedom to express his or her opinion outside the pulpit." (*Id.* at ¶ 35.) In practice, however, the UUA has in recent years become a practitioner of the progressive "cancel culture" that has become a hallmark of so many American institutions.

In 2019, the UUA initiated its first cancellation of a minister. Then-UU minister Rev. Todd Eklof published 200 copies of a book he had written entitled *The Gadfly Papers*, which was critical of "woke incidents" within the UU churches. The mob erupted to target Rev. Eklof

and pressured the UUA to violate its own policies and procedures. Within a year, the UUA had stripped Rev. Eklof of his credentials as a minister. (*Id.* at ¶ 43).

Plaintiff's own troubles with the UUA began when she defended Rev. Eklof's right to freedom of expression and criticized the UUA and the Unitarian Universalist Ministers Association ("UUMA") for ignoring their own bylaws, policies, and procedures in stripping Eklof of his credentials. Plaintiff quickly became the next target. In April of 2021, three ministers — the Rev. Sarah Skochko, the Rev. Dr. Cynthia L. Landrum, and the Rev. Amy Petrie Shaw — none of whom Plaintiff has ever met, filed a joint complaint against Plaintiff for alleged ministerial misconduct. In particular, the complaint focused on Plaintiff's communications with the three ministers on social media, alleging that she had "defamed" them as well as engaged in other unspecified "professional conduct" violations. But the complaint provided no examples of these supposedly defamatory communications — that is, communications containing false statements of fact. Rather, it just provided statements of Plaintiff's opinion on various issues. And opinions, by definition, are not defamatory. (*Id.* at ¶¶ 43-49).

Then, instead of adjudicating the complaint according to their established policies and procedures, Defendants disregarded important procedural protections in their policies and kowtowed to the woke mob, performing a completely inadequate "investigation" and producing a report to which Plaintiff had no meaningful opportunity to respond. They stripped her of her credentials as minister, cut off her pension payments, and sent a letter to thousands of UUA ministers and churches falsely stating, among other things, that Rohde had committed defamation. Defendant Lammert then held a meeting with officials from the Unitarian Congregation of West Chester, where Plaintiff was emeritus minister, after which Plaintiff was effectively stripped of her honorary title of emeritus minister. (Rohde Aff. at ¶ 13).

### III.   LEGAL STANDARD

On a Rule 12(b)(6) motion, all factual allegations of the complaint are accepted as true, "and the plaintiff must be given the benefit of every favorable inference." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Subject to some exceptions not at issue here, on a 12(b)(6) motion, "a district court . . . may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

The complaint need only be "facially plausible," meaning "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In other words, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Houser v. Feldman*, 600 F. Supp. 3d 550, 560 (E.D. Pa. 2022) (internal quotations omitted).

Defendants have also brought their motion pursuant to Rules 12(b)(1) and 12(b)(2). As Defendants point out, when deciding motions to dismiss pursuant to 12(b)(1) and 12(b)(2), the Court "may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000). However, contrary to Defendants' argument, only personal jurisdiction is at issue in this case, not subject-matter jurisdiction. *See infra* pp. 5-7. Accordingly, the Court should decline to consider the evidence Defendants have submitted in support of their Rule 12(b)(1) motion, which for the reasons that follow is actually a Rule 12(b)(6) motion.

IV.   **ARGUMENT**

**A. This Court has Subject-Matter Jurisdiction.**

1)   *The 'Ministerial Exception' Does Not Create a Jurisdictional Bar Under 12(b)(1), but Rather Must Be Addressed Under 12(b)(6).*

Defendants argue that Plaintiff's claims must be dismissed pursuant to the so-called "ministerial exception," which holds that the First Amendment prohibits courts from resolving claims "the resolution of which would limit a religious institution's right to select who will perform particular spiritual functions." *Petruska v. Gannon Univ.*, 462 F.3d 294, 307 (3d Cir. 2006).  Defendants treat their assertion of the ministerial exception as a matter of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), and in so doing, ask this Court to consider hundreds of pages of evidence from outside of the pleadings. However, the law is crystal clear that this is a question to be considered not under Fed. R. Civ. P. 12(b)(1) but rather under 12(b)(6).

In *Petruska*, the district court dismissed a former university chaplain's claim pursuant to 12(b)(1), holding that her claims were barred by the ministerial exception. The Third Circuit disagreed and remanded the plaintiff's contract claims to the district court, holding that

> [T]he [ministerial] exception does not act as a jurisdictional bar, but rather, is best viewed as a challenge to the sufficiency of Petruska's claim under Rule 12(b)(6). *See, e.g., Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004); *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 654 (10th Cir. 2002).

*Petruska*, 462 F.3d at 304.

In other words, the Court said, "The exception may serve as a barrier to the success of a plaintiff's claims, but it does not affect the court's authority to consider them. We therefore review Petruska's complaint to determine whether she has stated a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* at 303.

In *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012), the Supreme Court directly addressed this issue in light of a circuit split that had arisen over

whether the ministerial exception is an affirmative defense or a jurisdictional bar — and sided

with the Third Circuit's decision in *Petruska*:

> We conclude that the exception operates as an affirmative defense to an otherwise
> cognizable claim, not a jurisdictional bar. That is because the issue presented by the
> exception is 'whether the allegations the plaintiff makes entitle him to relief,' not whether
> the court has 'power to hear [the] case.'

*Hosanna-Tabor*, 565 U.S. at 195 n.4.

Courts in the Third Circuit have continued to follow *Petruska* and *Hosanna-Tabor* in

holding that the ministerial exception is not a jurisdictional bar. *See, e.g.*, *Lee v. Sixth Mount

Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (the ministerial

exception 'operates as an affirmative defense to an otherwise cognizable claim, not a

jurisdictional bar'); *Koenke v. St. Joseph's Univ.*, 2021 U.S. Dist. LEXIS 3576, *4 n.3 (E.D. Pa.

Jan. 8, 2021) (affirming *Petruska*'s holding that the ministerial exception "is best viewed as a

challenge to the sufficiency of [Plaintiff's] claim under Rule 12(b)(6)").

### 2) *In Addressing Defendants' Ministerial Exception Argument, the Court Must Disregard Evidence from Outside the Pleadings*

On a 12(b)(1) motion, a court may "consider evidence outside the pleadings to resolve

factual issues bearing on the jurisdictional issue." *Dalessio v. United States HUD*, 528 F. Supp.

3d 341, 345 (E.D. Pa. 2021). Not so on a 12(b)(6) motion, where "[a]s a general matter, a district

court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re

Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Defendants have

attached two affidavits (including hundreds of pages of exhibits) to their motion to dismiss, both

in support of their subject-matter jurisdiction argument and their personal jurisdiction argument.

While this court may legitimately consider evidence related to the issue of personal jurisdiction,

it must disregard this extraneous evidence when addressing the ministerial exception argument,

which should properly have been brought pursuant to Fed. R. Civ. P. 12(b)(6), not 12(b)(1).

Defendants have filed two affidavits that present their own version of the facts in this case, and have incorporated many of those alternative facts into their motion to dismiss. (*See* Memorandum of Law in Support of Defendants' Motion to Dismiss, Doc. 16, pp. 1-5; Affidavit of Carey McDonald, Doc. 16-1; Affidavit of Sheldon Bennett, Doc. 16-2.) Only a handful of these alternative facts relate to Defendants' personal jurisdiction arguments; the rest relate to the substance of Plaintiff's allegations that Defendants violated her rights in tort and contract. In considering whether the ministerial exception insulates Defendants from liability and whether Plaintiff has stated a claim for breach of contract and defamation, this Court must consider only the facts set forth in the Complaint, and must construe them in the light most favorable to Plaintiff. *See Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015) ("When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a district court must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.")

**B.  This Court has Personal Jurisdiction.**

Pennsylvania's long-arm statute grants personal jurisdiction over out-of-state parties who cause "harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth," 42 Pa.C.S. § 5322 (a)(4). As the Pennsylvania Supreme Court has explained,

> When a state exercises personal jurisdiction over a non-resident defendant in a suit arising out of or related to the defendant's contacts with the forum, the state is exercising specific jurisdiction. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n. 8 (1984). In such a case, the relationship between the defendant, the forum and the litigation is the foundation of the in personam jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683, 698 (1977).

*Kubik v. Letteri*, 532 Pa. 10, 16, 614 A.2d 1110, 1113 (1992). And as Defendants acknowledge, "In Pennsylvania, courts may exercise personal jurisdiction over a defendant to the fullest extent

permitted under the Federal Constitution." (ECF No. 16 at 14, *citing Imo Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998)).

   1) *Defendants Expressly Aimed Their Tortious Conduct at the Forum*

   "When alleging personal jurisdiction over nonresident defendants who allegedly committed an intentional tort outside the forum, a plaintiff must meet the United States Supreme Court's 'effects test' set forth in *Calder v. Jones*, 465 U.S. 783 (1984)." *Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 451-52 (E.D. Pa. 2021). As explained by the Third Circuit, the *Calder* effects test "requires the plaintiff to show that:

> (1) The defendant committed an intentional tort;
>
> (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and]
>
> (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001), *see also Imo Indus*. at 265-66.

   Defendants do not deny that Rohde alleges torts that are intentional in nature, so the first prong of the *Calder* test is satisfied at the motion to dismiss stage. Likewise, Plaintiff has sufficiently pled that she has "felt the brunt of the harm" within the Eastern District of Pennsylvania, in which she worked and continues to reside, by "lowering her reputation in the community and threatening her future ability to preach, speak, or otherwise earn a living," (ECF No. 1 at ¶¶ 176, 185), and by refusing to pay her the retirement stipend she relied upon, had earned, and was promised. (*Id.* at ¶¶ 189, 198.)

   Defendants argue that their conduct does not fulfill the third prong of the *Calder* effects test, claiming that "the main Pennsylvania-related activity alleged – UUA's email communicating the decision to remove Rohde from Fellowship – is simply not an 'activity

purposefully directed toward' Pennsylvania," (ECF No. 16 at 16, since "96% of the [2,950] email notices" with the defamatory statements were sent to recipients "elsewhere in the U.S.," *id*. at 18.) Defendants, therefore, ask this Court to find that Plaintiff — a resident of this District, who was defamed in messages sent to people in this District that caused her damage within this District — should have no recourse to courts within this District simply because Defendants *also* defamed her to thousands of people not in this District.

While a defendant must "evince an intent to interact with the forum to justify the exercise of personal jurisdiction," *Gorman v. Jacobs*, 597 F. Supp. 2d 541, 548 (E.D. Pa. 2009), this interaction need not be restricted to that forum alone. In the context of a website, for example, the Third Circuit found that "[i]f a defendant web site operator intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003). As *Gorman* put *Toys "R" Us'* holding, "exercise of personal jurisdiction [was] appropriate if 'the defendant intentionally interact[ed] with the forum state via the web site.'" *Id*. at 548.

Defendants' own citation of *Toys "R" Us* in a footnote, arguing that "electronic newsletters and other email correspondence [do] not trigger personal jurisdiction if they do not show purposeful availment" (ECF No. 16 at 16, n.22, citing *Toys "R" Us* at 455), is inapposite because the facts of this case, unlike *Toys "R" Us*, **do** show purposeful availment. The email newsletter at issue in *Toys "R" Us* was a commercial circular from a Spanish company whose websites were entirely in Spanish and that shipped merchandise only to Spanish addresses. And while anyone could "receive newsletters with only an email address," *id*. at 454, the newsletter asked registrants "to indicate their residence using fields that are not designed for addresses in

the United States." *Id.* It is difficult to imagine a clearer set of indicia that the company was not aiming those newsletters at New Jersey.

Defendants' defamatory email was entirely different from the commercial circular in *Toys "R" Us.* UUA's newsletter defaming Plaintiff was not a generic advertisement for toys. Defendants mentioned Plaintiff by name. Their audience was not the general (Spanish) public but "UU and congregation leaders and ministers nationwide" (ECF No. 16 at 18) — the very audience among whom those statements could (and did) do the most reputational damage to Plaintiff. And as Defendants acknowledge, they intentionally sent that message to dozens of people in Pennsylvania.

Indeed, the facts of this case are a much closer analog to the facts of *Calder* itself, a defamation case that the Third Circuit explained was about a newspaper article "written and edited in Florida and published nationwide concerning the California activities of a California resident." *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001). *Calder* held that "California had personal jurisdiction over the author and editor because the 'effects' of their Florida conduct were chiefly felt in California, the state in which plaintiff lived and worked." *Id*. And, as in *Calder*, Plaintiff here alleges that the defamation "was not 'mere untargeted negligence' but rather 'intentional, and allegedly tortious, actions . . . expressly aimed at [the forum state].'" *Id*.

In line with *Calder*, this District has continued to rule that those committing intentional torts against persons within its borders cannot force their victims to litigate in faraway jurisdictions by simply ensuring that they widen the geographical reach of their offenses using modern technology such as email or social media platforms. As explained in one recent case in this District,

> Defendant's alleged tweet about Plaintiff, a Pennsylvania resident, to an employee of Plaintiff's company, located in Philadelphia, satisfies the "expressly aimed" prong of the

effects test. Defendant allegedly sent defamatory material to individuals in Pennsylvania, knowing that Plaintiff would suffer harm in Pennsylvania. Further, Plaintiff submitted an affidavit suggesting that Defendant deliberately targeted readers in Philadelphia.

*Gorman v. Shpetrik*, No. 20-4759, 2022 U.S. Dist. LEXIS 42389, at *6 (E.D. Pa. Mar. 10, 2022). If an allegedly defamatory tweet aimed at someone in Pennsylvania about a person in Philadelphia satisfies the "expressly aimed" prong of the *Calder* test, an email sent to dozens of people in that jurisdiction surely does as well.

Other actions by Defendants UUA and Lammert further serve to remove any doubt that Defendants did not hesitate to purposefully avail themselves of the forum to spread their defamatory message. (Affidavit of K. Rohde at ¶¶ 13-15; 18-20.) Plaintiff learned that after sending the defamatory email, Defendant Lammert held a private meeting with the leadership of the local congregation within the Eastern District of Pennsylvania where Plaintiff was minister emerita, after which that congregation became aggressively hostile towards Plaintiff. (*Id*. at ¶13-15.) Added to the facts alleged surrounding the transmission of the email, there can be little doubt that Defendants "expressly aimed [their] tortious conduct at the forum," fulfilling the third prong of the *Calder* effects test. *Remick*, at 258.

2) *Defendants Had Sufficient 'Minimum Contacts' with the Forum*

"The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have 'certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945) (quotation marks and citations omitted)." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). This is to ensure that a defendant has "fair warning" that he or she may be sued in that state. *Id.*, *citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

While the Supreme Court has determined that the necessary minimum contacts could be established with regard to intentional torts (as in the present case) through the "effects" test, *Calder* at 789, courts can also find specific jurisdiction to lie through the "traditional three-step analysis for specific jurisdiction," *Marten*, at 296. "First, the defendant must have purposefully directed his activities at the forum. Second, the plaintiff's claim must arise out of or relate to at least one of those specific activities. Third, courts may consider additional factors to ensure that the assertion of jurisdiction otherwise comport[s] with fair play and substantial justice." *Id*. (Internal citations and quotation marks omitted.)

Defendants argue that Plaintiff's contract claim cannot satisfy this minimum contacts test, calling the existence of any contract between any of Defendants and Plaintiff "demonstrably untrue…neither UUA nor USPS have any contractual relationship with Rohde, for purposes of 'her services as a minister in Pennsylvania' or any other purpose." (ECF No. 16 at 19.) But Defendants have *not* demonstrated that it is "untrue" that a contractual relationship existed between themselves and the Plaintiff — and if such a relationship does exist, Defendants' decision to take on contractual obligations in the forum "justifies the exercise of specific jurisdiction as a quid pro quo for [Defendants'] enjoyment of the right to form binding contracts in Pennsylvania." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007).

"On a motion to dismiss, a court must 'accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff.'" *Doe v. Princeton Univ*., 30 F.4th 335, 340 (3d Cir. 2022), *quoting Umland v. PLANCO Fin. Servs*., 542 F.3d 59, 64 (3d Cir. 2008). Plaintiff clearly alleges the existence of a contractual relationship with Defendants UUA and USPS, (ECF No. 1 at ¶¶ 186-210), and tortious interference with those contractual relationships by Defendant Lammert. (*Id.* at ¶¶ 211-216.)

To adequately plead a claim for breach of contract under Pennsylvania law, Plaintiff must allege: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Miller v. Amazon.com Servs.*, 543 F. Supp. 3d 80, 89 (E.D. Pa. 2021), *quoting Meyer, Darra.gh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 635 Pa. 427, 137 A.3d 1247, 1258 (Pa. 2016), *citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc*., 2002 PA Super 39, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002). That is precisely what Plaintiff has done. She has alleged the existence of contracts with UUA and USPS. (ECF No. 1 at ¶¶ 187, 196.) She has explained the essential terms of those contracts and how they were breached, among them 1) that the UUA acted in bad faith and in violation of its policies and procedures when it stripped her of her Fellowship (*Id*. at ¶ 188; 2); that UUA and USPS breached that contract when they stripped her of the retirement stipend she had earned through her years of service and in an amount determined by her total years of service (*Id*. at ¶¶ 189-190, 197-198, 205); and 3) that she even agreed to a smaller monthly stipend so that her husband would receive survivor benefits. (*Id*. ¶¶ 192, 199, 206.) And Plaintiff has pled that she suffered damages from these breaches. (*Id*. ¶¶ 194, 202, 209.)

By framing their dispute over the existence of a contractual relationship as a jurisdictional issue, Defendants attempt to force this Court to decide the merits of Plaintiff's contract claims before the discovery needed to establish the facts can even be conducted. Yet if Plaintiff can demonstrate a contractual relationship between herself and Defendants, there can be little doubt that this Court has jurisdiction, as her claims result from her long career in the District as a UU minister and would therefore "directly and closely relate to a continuing contractual obligation that arose in Pennsylvania," *O'Connor,* at 323, and Plaintiff's claims would therefore "arise out of or relate to" Defendants' contracts in the state. *Id*. at 324.

**C. Plaintiff's Claims Are Not Barred by the Ministerial Exception and State Claims for Relief**

While religious institutions have broad authority under the First Amendment in ecclesiastical matters, including selecting and appointing their own ministers, religious institutions are not immune from suit, particularly when those suits involve non-doctrinal matters. "All disputes among members of a congregation [] are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on wills, trusts, contracts, and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine [and so] the question of what they agreed to do, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts." *Presbytery of Beaver-Butler of United Presbyterian Church in U.S.A. v. Middlesex Presbyterian Church*, 489 A.2d 1317 at 1320-21 (Pa. 1985).

The Supreme Court has articulated a "neutral principles" approach to disputes involving churches. *United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440 (1969). Generally, where resolution of a dispute does not require "the courts to engage in the forbidden process of interpreting and weighing church doctrine," the courts have a proper role in adjudicating the matter. *Id.* at 451. The Pennsylvania Supreme Court adopted the neutral principles approach espoused in *Mary Elizabeth Blue Hull* and indicated that the same principles of law apply to religious and non-religious associations where the dispute does not involve or require any ecclesiastical inquiry. *Presbytery of Beaver-Butler*, 489 A.2d 1317 at 1323.

In 2012, the Supreme Court carved out an exception to the "neutral principles" approach for employment discrimination claims by ministers against their churches, known as the "ministerial exception." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 564 U.S. 171, 181, 188 (2012). *Hosanna-Tabor* addressed a religious teacher's right to sue her

14

Church employer for discrimination.  The Court held the religious teacher to be a minister, noting the teacher's "significant degree of religious training," which included eight courses in "biblical interpretation, church doctrine, and the ministry of a Lutheran teacher." *Id.* at 191. The church had provided a religious reason for the teacher's termination, which the teacher argued was pre-textual.  The Court held that "[i]n order to probe the real reason for respondent's firing, a civil court—and perhaps a jury – would be required to make a judgment about church doctrine." *Id*. at 205. Such a pretext inquiry was prohibited by the First Amendment, because it would "require calling witnesses to testify to the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment" of both church belief and the church's mission. *Id*.

The *Hosanna-Tabor* Court expressly declined to extend the ministerial exception to other contexts beyond federal employment discrimination claims, writing, "we express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their employers." *Id.* at 196. The Third Circuit, likewise, has also not endorsed a broad application of the ministerial exception to all minister claims in tort or contract.  Rather, the Third Circuit has expressed that "[a] church is always free to burden its activities voluntarily through contract, and such contracts are fully enforceable in civil court" because "enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit on a Church's free exercise rights." *Lee v. Sixth Mt. Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 120 (3d Cir. 2018).  Outside of employment discrimination claims by ministers, the ministerial exception and church autonomy doctrines do not prevent courts from resolving "disputes that turn on a question devoid of doctrinal implications and employ neutral principles of law to adjudicate." *Lee* at 120 (internal citations and quotations

omitted). The ministerial exception does not apply to Plaintiff's claims, as Plaintiff is not a "minister" as defined by the ministerial exception, and as Plaintiff's claims are based in both tort and contract and can be resolved with neutral principles of law requiring no inquiry into church doctrine or religious teaching.

   1)  *Plaintiff is not a "Minister" Subject to the Ministerial Exception.*

In 2020, the Supreme Court provided guidelines for what constitutes a "minister" for purposes of the ministerial exception, making clear that "[s]imply giving an employee the title of 'minister' is not enough to justify the exception." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020). The ministerial exception applies to "those holding certain *important position*s with churches and other religious institutions." *Id*. at 2060 (emphasis added). A court's role is not "to decide which titles count and which do not," but rather to assess "what an employee does." *Id*. at 2064.  Whether an employee is subject to the ministerial exception "rests not on ordination status or formal title, but rather on functional status as the type of employee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amendment guarantees." *Hosanna-Tabor*, 565 U.S. at 206.

Even an active employee who is an ordained minister may not be subject to the ministerial exception if that employee does not perform ministerial duties. *Trotter v. United Lutheran Seminary*, No. 20-570, 2021 U.S. Dist. LEXIS 142222 (E.D. Pa. July 29, 2021). In *Trotter*, the employee was an ordained minister referred to as "Pastor Trina." *Id.* at *11. Pastor Trina attended a Lutheran ministry conference on behalf of her employer and provided various student administrative services including facilitating chaplain or ministry care for students.  *Id*. at *10. The court denied the seminary's summary judgment motion on the ministerial exception theory, holding the employee's role was not to perform ministerial duties, but to oversee religious processes and provide referrals. *Id.* at *12-13. The employee, while an ordained

minister, was not a "minister" for the purposes of the ministerial exception. *Id*. "Courts consider the ministerial exception on a position-by-position basis. "What matters, at bottom, is what an employee does."" *Id.* at *10 (quoting *Our Lady of Guadalupe*, 140 S.Ct. at 2067).

Rohde has no duties as she is retired. (ECF No. 1 at ¶ 4.). Rohde had been retired for over six years at the time the UUA initiated its unprecedented and vindictive actions against her. (*Id*.) Like "Pastor Trina," Rohde does not perform ministerial duties for the UUA. In fact, Rohde has no employment "duties" at all. Considering the ministerial exception on a "position-by-position basis," Rohde is unlike any of the "ministers" in the aforementioned cases, or any of the cases noted by Defendants in the Motion to Dismiss, because she is not actively employed. *See, e.g., Yaggie v. Indiana-Kentucky Synod Evangelical Lutheran Church*, 860 F. Supp. 1194 (W.D. Ky. 1994) (active pastor's claims dismissed); *Hutchinson v. Thomas,* 789 F.2d 392 (6th Cir. 1986) (active minister's claims dismissed); *Farley v. Wis. Evangelical Lutheran Synod*, 821 F. Supp. 1286 (D. Minn. 1993) (active minister's defamation claims dismissed); *Higgins v. Maher* 210 Cal App. 3d 1168 (active priest's claims dismissed).

In addition, unlike other religious organizations, the UUA is not a theological organization, as it does not require its ministers to adopt a specific set of doctrinal or theological beliefs. (ECF No. 1 at ¶ 30.) In fact, the UUA *prohibits* theological requirements for religious educators, so credentialing as a minister or religious teacher is not doctrinal or religious. (*Id*. at ¶¶ 31, 32.) The foundational principle for the ministerial exception, explained in both *Hosanna-Tabor* and *Lee*, is the right of a religious organization to inculcate and protect their *religious doctrine* through their ministers. *Hosanna-Tabor*, 565 U.S. at 201; *Lee*, 903 F.3d at 122-23. "When it comes to the expression and inculcation of *religious doctrine*, there can be no doubt that the messenger matters." *Hosanna-Tabor*, 565 U.S. at 201. "The ministerial exception gives

concrete protection to the free "expression and dissemination of any *religious doctrine*." *Id.* at 202 (emphasis added).

Plaintiff has alleged that the UUA has no religious doctrine, because it is a philosophical or political organization. (ECF No. 1 at ¶¶ 33-36). Unlike the church parties in all the aforementioned cases, therefore, an inquiry into the actions of the UUA would not "require consideration of church doctrine." *Lee* at 122. There is no precedent applying the ministerial exception to a UUA "minister," let alone a retired minister of any religious denomination, because the very purpose of the ministerial exception is to protect doctrinal or theological beliefs.

### 2) Contract-Based Claims

To establish breach of contract, a plaintiff must show: (1) the existence of a contract and its essential terms, (2) breach of a duty imposed by the contract, and (3) damages that result. *Lacker v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006) (internal citations omitted). If an action in contract is unenforceable, to avoid an injustice, promissory estoppel provides equitable relief. *Crouse v. Cyclops Indus.* 560 Pa. 394, 402 (Pa. 2000). To maintain a claim for promissory estoppel, a "party must show that 1) the promisor made a promise that should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Id*.

The Third Circuit has allowed discharged ministers alleging breach of contract "to proceed beyond the pleading stage and attempt to show with discovery that the resolution of his or her claim would not entangle courts in internal religious doctrine and governance." *Lee* at 122 (holding on summary judgment that Church had provided a spiritual reason for termination of plaintiff). *See also Petruska v. Gannon Univ.*, 462 F.3d 294, 310-12 (3d. Cir. 2006) (vacating

and remanding to district court dismissal of minister's breach of contract claim because the claim on the "outset" did not turn on ecclesiastical inquiry, but if further proceedings "raise issues of excessive entanglement, the claims may be dismissed on that basis on summary judgment.").

In *Lee,* a minister alleged breach of contract against his former church. The *Lee* Court affirmed the church's motion for summary judgment, *after discovery*, on the grounds that discovery had showed the pastor's contract provided for termination for a "material breach" of the contract, and the "material breach" was spiritual in nature. *Lee*, at 120-121. Evidence produced during discovery demonstrated that the pastor's responsibilities included "spiritual leadership and furthering the mission of the Church." *Id*. at 121. The Church pointed to decreased church contributions and attendance during the pastor's tenure and an internal church report citing the pastor's "failures in spiritual stewardship."  *Id*. The *Lee* Court found these reasons to be spiritual in nature, and that such questions impermissibly entangled the court in religious governance and doctrine prohibited by the Establishment Clause. *Id*.

*Lee* affirmed the district court's holding that the minister's contract claim requiring an inquiry into Lee's failures in spiritual stewardship. *Lee v. Sixth Mt. Zion Baptist Church of Pittsburgh*, 2017 U.S. Dist. LEXIS 133858, *92 (W.D. Pa. 2017).  The district court in *Lee* distinguished Lee's case from out-of-district cases where ministers' claims for breach of contract were resolved "subject to entirely neutral methods of proof." *See Lee*, at *90 (discussing *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 at 1359-61). One such case involved a minister's breach of contract claim regarding payment of a stipend. *See also Lee*, at *90-91 (discussing *Gregorio v. Hoover*, 238 F. Supp. 3d 37 (D.D.C. 2017).  The minister's claim proceeded, "because at this early stage it [was] not entirely clear that resolution

of [Plaintiff's] claim [would] require anything other than "neutral methods of proof," dismissal on ministerial exception grounds [was] not warranted." *Gregorio*, 238 F. Supp. at 48.

Here, as in *Gregorio*, *Lee*, *Minker*, and *Petruska*, Rohde has alleged a breach of contract by the Defendants and, at this stage of the litigation, each element of her contract claim can be assessed with "neutral methods of proof" that "would not entangle courts in internal religious doctrine and governance." *Gregorio*, at 48; *see also Lee*, at 120. Rohde has pled that she had an existing contract with the UUA that included (1) the processes and policies of the UUA for the credentialing, discipline, and termination of ministerial Fellowship and (2) the UUA and Unitarian Service Pension Society (USPS)'s promise to pay her a retirement stipend or pension upon her retirement in consideration for her years of service in UU ministry. (ECF No. 1 at ¶¶ 55; 126-127.)  Rohde has alleged that the UUA and USPS breached their contracts with her by failing to act in good faith in carrying out its contractual obligations, by violating its policies and procedures in removing her from Fellowship after her retirement, and by stripping her of her retirement stipend in bad faith and without cause nine years into her retirement. (*Id*. at 186-202.) Rohde has also pled promissory estoppel, as she reasonably relied on the UUA's promise of a stipend and selected a smaller stipend with survivor benefits for her spouse. (*Id*. 162-167.) Rohde has suffered damages as a result of Defendants' broken promises, and injustice can be avoided only by enforcing these promises. (*Id*. 168).

     a.  <u>Contract-Based claims for Fellowship Removal</u>

The UUA is responsible for ministerial credentialing, but each UUA-affiliated church is able to select its own ministers, from any religious background. (ECF No. 16 at 1.) As a professional credentialing body and membership association, the UUA's bylaws, rules, and membership policies are a binding contract between the organization and its members.  *Oliver v. SEIU Local*, 415 F. Supp. 602, 668 n.6 (E.D. Pa. 2019) ("the regulation of the relationship

between union and employee is a contractual matter governed by local law") (quoting *Scofield v. NLRB*, 394 U.S. 423, 426 n.3 (1969)). *See also Berberian v. Lancaster Osteopathic Hosp. Assoc., Inc.*, 149 A.2d 456, 459 (Pa. 1959) (a hospital granting "privileges" is bound to staff through the by-laws "just like a voluntary association is bound by the provisions of its by-laws…[because]…the respective organizations have enacted and approved the by-laws which are an integral part of the contractual relationship between such organizations and their members or ones holding under them"). These bylaws and rules and conditions for membership, when not religious or doctrinal, are enforceable in contract in Pennsylvania. *See Lee*, 903 F.3d at 120 (discussing how "a church is always free to burden its activities voluntarily through contract, and such contracts are enforceable in civil court.")

The primary objective in construing any contract is to effectuate the intentions of the parties. *Trizechahn Gateway, LLC v. Titus*, 930 A.2d 524, 537 (Pa. Super. 2007). In addition, in Pennsylvania, "[e]very contract imposes a duty of good faith, honesty and fair dealing on the parties in the performance and the enforcement of the contract." *Giant Food Stores, LLC v. THF Silver Spring Dev., L.P.*, 959 A.2d 438 (Pa. Super. 2008); *see also* 13 Pa. Cons. Stat. Ann. § 1203 (1984). "The obligation to act in good faith in performance of contractual duties varies somewhat with context, and a complete catalogue of types of bad faith is impossible, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain…" *Somers v. Somers*, 418 Pa. Super. 131, 136-137 (PA Super. 1992) (citing Restatement (Second) of Contracts, § 205(d)).

Likewise, a similar requirement has been developed in the common law called the "doctrine of necessary implication," which states: "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that

according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Palmieri v. Partridge*, 853 A.2d 1076, 1079 (Pa. Super. 2004). "Courts employ the doctrine of necessary implication as a means of avoiding injustice by inferring contract provisions that reflect the parties' silent intent." *Id*.

Here, Plaintiff's complaint is replete with evidence that Defendants acted in bad faith and outside of the intentions of the parties to cancel Plaintiff's ministerial fellowship and breach their contractual obligations to her.  (*See* ECF No. 1 at ¶¶ 55-57; 63-64; 72-74; 80-82; 90; 92; 94-96; 102-104; 107; 111-116). These bad faith actions included "evading the spirit of the bargain" by using policies and procedures intended to prevent the sexual abuse of minors to remove a long-since-retired minister from fellowship for social media comments. (*Id*.). Defendants ignored their own policies regarding notice and an opportunity to be heard. (*Id*. at ¶¶ 53; 74; 80; 89-90; 96; 102-103; 111; 115; 155).  They refused to notify Plaintiff of what rules or policies she had allegedly transgressed, refused to allow her to submit obviously relevant exculpatory evidence, and refused to interview any witnesses who actually knew her from her ministry. (*Id*. at ¶¶ 105-107). These are all non-doctrinal and non-religious contractual provisions.

The UUA's credentialing process for clergy is affirmatively non-religious and non-doctrinal, with the UUA bylaws stating that "No minister shall be required to subscribe to any particular creed, belief, or interpretation of religion…" (ECF No. 1 at ¶ 31).  Like other credentialing organizations, the UUA does not hire ministers, but rather offers them credentials to serve in UU churches. (*Id.* at ¶ 26-27). Ministerial credentialing with the UUA is a three-year process, with yearly renewal required during those three years. (*Id.* at ¶ 27.) After three years, credentialing is permanent, subject to termination only for specified cause, and only after notice

and an opportunity to be heard. (*Id.*) The UUA policies and procedures for termination of fellowship are likewise non-doctrinal and non-religious and were implemented to adjudicate complaints involving sexual abuse of minors or other serious crimes. (*Id.* at ¶¶ 57, 64). When Plaintiff went through the UUA's three-year credentialing process, and throughout her decades-long career, the UUA's processes for fellowship removal were reasonably understood by all parties to apply only to very serious crimes, mostly sexual misconduct. (Rohde Aff. at ¶11; ECF No. 1 at ¶¶ 57, 63-64).

Likewise, in 2014, when Plaintiff retired and began receiving stipend payments, the UUA's rules for removal from fellowship had only applied to those committing serious safety violations, primary sexual misconduct. (ECF No. 1 at ¶¶ 57, 63-64).  Defendants' Motion to Dismiss admits it was the understanding of the entire UU community that the policies under which Plaintiff was removed had long been reserved for the use in cases involving sexually abused minors. (ECF No. 16 at 5 n.9.)  Indeed, Defendants' excuse for defaming Rohde in a letter to thousands of congregations was that their statements were somehow necessary to clarify that Rohde had not engaged in the sexual abuse of minors. (*Id.*). The UUA's actions are demonstrably outside the intention of the parties at the time of ministerial credentialing, during Plaintiff's decades of service to the UU churches, and at and after Plaintiff's retirement. That the UUA would weaponize ministerial termination policies intended to address sexual abuse or violent crimes by ministers to strip a retired minister from fellowship for social media comments is an obvious evasion of the spirit of the bargain. *Somers*, 418 Pa. Super. at 136-137 (citing Restatement (Second) of Contracts, § 205(d)).

     b.  <u>Contract-Based Claims for Plaintiff's Retirement Stipend</u>

Upon her retirement in 2014, Rohde applied for her pension. (ECF No. 1 at ¶ 124). This pension is available to all retired UU ministers who have reached the age of 66 and served at least 20 years in the UU ministries. (*Id.* at ¶ 122.) The amount of the pension stipend is based on a minister's accumulated years of service when payments begin, and whether the minister has designated their spouse to continue to receive the payments after their death. (*Id.* at ¶ 123.)  In reliance on the UUA's promises, Rohde elected to receive a smaller stipend payment each month, with a survivor benefit for her spouse, rather than to elect a larger stipend with no survivor benefits. (*Id*. at ¶ 124.)  Rohde received regular payments until November 2022, when the UUA retroactively stripped her of her fellowship and retirement stipend. (*Id.* at ¶¶ 95, 189).

Rohde's retirement stipend was earned in consideration for her 34 years of service in UU ministry, and the amount was determined in 2014 based on her total accumulated years of service in UU ministry. (*Id.* at ¶ 190).  Defendants' Motion to Dismiss introduces their own version of facts regarding this stipend, many of which are directly contrary to the facts pled in Plaintiff's Complaint, as well as Defendants' own Affidavits.[1] (*See, e.g.*, ECF No. 16 at 10 ("the service gratuity does not, as claimed by Rohde, accrue based on the number of years of service"), which directly contradicts Defendants' supporting affidavit SB ¶ 6, which states that "the service gratuity is determined by years of service.")  Plaintiff objects to Defendants' attempt to convert this into a motion for summary judgment by introducing extensive documentation and facts related to Plaintiff's contract for her "service gratuity" or pension.[2]  The documents introduced outside the pleadings are notably unrelated to UUA doctrine or theology, but are documents administering Plaintiff's stipend, and so discovery on this matter would not fall within the

---

[1] It is Plaintiff's position, *see supra* pp. 5-7, that the Court should not consider evidence from outside of the Complaint because Defendants' arguments are properly heard under Fed. R. Civ. P. 12(b)(6), not 12(b)(1). However, Plaintiff has also chosen to refer to that evidence where necessary in the event the Court does consider it.
[2] Defendants have introduced 250 pages of additional documentary evidence from outside the pleadings.  including

grounds of the ministerial exception. See *Lee*, 903 F.3d at 120. Plaintiff lacks discovery evidence

on documents she signed regarding her stipend and various UUA policies and procedures in

effect at the time of her retirement.[3]   At a minimum, Plaintiff should be permitted "to proceed

beyond the pleading stage and attempt to show with discovery that the resolution of [her] claim

would not entangle courts in internal religious doctrine and governance." *Lee*, at 122.

> 3) *Regarding Plaintiff's estoppel claim, at the time of her retirement in 2014, Plaintiff*
> *relied on the UUA promise to pay her retirement stipend, and to act in good faith. To*
> *her detriment, Plaintiff selected a smaller stipend with survivor benefits for her*
> *spouse, rather than a larger stipend without a survivor benefit. (ECF No. 1 at ¶¶ 162-*
> *168.) The UUA made a promise to pay a retirement stipend that it reasonably*
> *expected to induce action or forbearance on the part of Plaintiff, and did induce*
> *action or forbearance, and an injustice can be avoided only by enforcing that*
> *promise. Crouse, 560 Pa. at 402.Defamation Claim*

> a. The falsity of Defendants' statement can be determined using neutral principles of
> law.

In Pennsylvania, courts have adopted an "element specific approach" to the church

autonomy or deference rule, permitting defamation claims against churches where "neutral

principles" can be applied to assess the claims. *See Connor v. Archdiocese of Phila.*, 601 Pa. 577

(2009) (holding that defamation claims against a church could proceed because both parties

could carry "their respective burdens as to each element of appellants' defamation claims

without 'intruding into the sacred precincts.'") *Id.* at 608 (quoting *Presbytery of Beaver-Butler of*

*United Presbyterian Church in U.S.A. v. Middlesex Presbyterian Church*, 489 A.2d 1317, 1321

(Pa. 1985)).  In *Connor*, the court conducted a "claim-by-claim, element-by-element" approach

to the question of whether to apply the church deference rule to Plaintiff's defamation claims

against the church. *Connor*, at 607 (citing *Petruska v. Gannon Univ.*, at 309-310). The alleged

defamatory statement that the plaintiff had "brought a weapon to the school" was not religious,

---

[3] Rohde Aff. at ¶ 3, 8-10.

and since the church cited no church authority that "weapon" had a special religious meaning, the court could "rely exclusively on objective, well-established concepts of defamation law familiar to lawyers and judges to resolve appellants' defamation claims." *Id.* at 615-616 (citing *Jones v. Wolf*, 443 U.S. 595, 603 (1979)) (internal quotations omitted).

Likewise, the Second Circuit recently reasoned that a minister's defamation claim against his church leaders could proceed because "secular components of a dispute involving religious parties are not insulated from judicial review; a court may use the 'neutral principles of law' approach." *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022). In *Belya*, a minister brought suit for defamation against individuals involved in the Russian Orthodox Church, contending he was defamed by statements claiming he had forged a series of letters related to his appointment as the Bishop of Miami. *Id.* at 625. These forgery allegations were central to church discipline proceedings that had removed Belya from ministry. *Id.* The district court denied defendants' motion to dismiss on the church autonomy doctrine and their motion to limit discovery or stay proceedings due to the church autonomy doctrine. *Id.* at 628. On appeal, the Second Circuit dismissed Defendants' church autonomy argument, noting that "[w]hen a case can be resolved by applying well-established law to secular components of a dispute, such resolution by a secular court presents no infringement upon a religious association's independence." *Id.* at 630. "The defamation claims asserted here hinge on crucial questions of fact, and, as the district court recognized, there are numerous 'disputes as to whether the factual situation presented fits into the [church autonomy doctrine].'" *Belya*, at 634 (quoting *Belya v. Metro. Hilarion*, 2021 U.S. Dist. LEXIS 95259, *2 (S.D.N.Y. May 19, 2021)). The Court further noted that "[d]ecidedly non-ecclesiastical questions of fact remain" related to whether the documents were actually

forged, and by whom, which "would not require a fact-finder to delve into matters of faith and doctrine." *Id*. at 634.

Similarly, here, Defendants' statement that Plaintiff "defamed colleagues" and that this finding was supported by "extensive documentation" is demonstrably false, and the court can "rely exclusively on objective well-established concepts of defamation law" without intruding into the "sacred precincts" to analyze Defendants' statement.  Like the term "weapon" in *Connor*, there is no special UUA religious meaning to the term defamation. Defendants assert the legal term "defame" was used in a "colloquial manner," offering an alternative dictionary definition for defame  — "to damage the reputation of a person or group by saying or writing bad things about them that are not true." (ECF No. 16 at 21). But even this decidedly non-sacred understanding of the term "defame" makes Defendants' statements about Plaintiff demonstrably false. (ECF No. 1 at  ¶¶ 112-113). Plaintiff did not write untrue statements about her colleagues that damaged their reputation. (*Id*. at ¶¶ 139; 172). And Defendants have no documentation, let alone extensive documentation, to support this assertion. (*Id*.)

Instead, Defendants published this false statement about Plaintiff with negligence or reckless disregard for the truth or falsity of the statement. Prior to the publication, Plaintiff had tried to submit evidence clearly demonstrating that none of her statements at issue were defamatory, but Defendant Lammert rejected Plaintiff's submission of this evidence. (ECF No. 1 at ¶ 114).  Rather than address any of this in their Motion to Dismiss, Defendants instead argue that their audience would have somehow understood the term they published, "defaming," to actually mean, "disparaging."[4]  (ECF No. 1 at 21-22). These words have different meanings and

---

[4] Disparage means "to criticize someone or something in a way that shows you do not respect or value him, her, or it" DISPARAGE | English meaning - Cambridge Dictionary

are not interchangeable. Defendants did not publish that Plaintiff had "disparaged colleagues,"[5] but that she was responsible for "defaming colleagues." This is a demonstrably false factual assertion that does not require the court to wade into the sacred precincts.

      b.  <u>Defendants published the defamatory statement without privilege.</u>

Under Pennsylvania law, the defendant bears the burden of proving both "the truth of the defamatory communication" and/or "[t]he privileged character of the occasion on which it was published." 42 Pa.C.S. § 8343. "Communications which are made on proper occasion, from a proper motive, in a proper manner, and which are based upon reasonable cause are privileged." *Moore v. Cobb-Nettleton*, 889 A.2d 1262, 1268 (Pa. Super. Ct. 2005); See also Restatement of the Law (Second), § Torts, 595. Abuse of a conditional privilege is indicated when "the publication is actuated by malice or negligence, is made for a purpose other than for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purposes." *Manning v. Flannery*, 528 Fed. Appx. 141, 143 (3d Cir. 2013) (internal citations omitted); *see also* Restatement (Second) Torts § 599 (1976). A defendant abuses or exceeds a privilege by "publishing the statement to more recipients than was necessary." *Scott v. Bailey*, 2023 U.S. Dist. LEXIS 154041, *5 (E.D. Pa Aug. 21, 2023). While it is a question of law whether privilege applies in a given case, it is a question of fact for the jury whether a privilege has been abused. *Montgomery v. City of Philadelphia*, 392 Pa. 178 (1958).

"When the legal question of privilege is interlaced with factual questions concerning its abuse, the issue of privilege generally cannot be resolved as a matter of law. The defense of

---

[5] Plaintiff does not admit to disparaging her colleagues, but rather makes the point that the term disparage had a different meaning from the term "defaming" which was the term actually published by Defendants.

conditional privilege in particular nearly always calls for factual determinations about the defendant's motives and mental state in publishing a defamation. We have thus held that privilege to defame is an affirmative defense which may not be decided on preliminary objections, but must be raised as 'new matter' in the defendant's answer." *Barber v. Lynch*, 275 Pa. Super. 333, 418 A.2d 749 (1980); see also Pa. R.C.P. 1030. When a plaintiff has pled facts supporting abuse of the conditional privilege, such as facts showing malicious motivation or negligence in the communication, the affirmative defense of conditional privilege should be raised in Defendant's answer, not as a matter of law on a motion to dismiss. *Bortz v. Roman Catholic Diocese of Allentown*, 2019 Pa. Dist. & Cnty. Dec. LEXIS 1255 *11-12 (2019). Likewise, a conditional privilege may be lost when the defamatory statements are published more broadly than to recipients that share a common interest in the subject matter and are entitled to know the information conveyed. *See Am. Future Sys., Inc. v. Better Bus. Bureau*, 592 Pa. 66 (Pa. 2007).

A conditional privilege may be lost for communications related to internal church proceedings if the publication extends beyond the internal church community. *See, e.g.*, *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468 (8th Cir. 1993) (minister's defamation claim against church Synod for statement that minister's prior marriage had ended in divorce could proceed, as Synod "circulated a personal information file containing the false information to at least 300 churches.") *See also Kliebenstein v. Iowa Conf. of United Methodist Church*, 663 N.W. 2d 404, 405-407 (Iowa 2003) (finding minister's letter about plaintiff was disseminated to members of the community and this "weaken[ed] [the] ecclesiastical shield" because the protections afforded under the ministerial exception may be lost upon proof of excess publication or publication 'beyond the group'"); *Lipscombe v. Crudup*, 888 A.2d 1171, 1173 (D.C. 2005)

(allowing defamation claim against a pastor for statement made outside of a church service and with others besides church members present); *Ausley v. Shaw*, 193 S.W.3d 892, 896 (Tenn. Ct. App. 2005) (holding First Amendment didn't bar minister's slander claim because statements were made after minister had been terminated and were made to church members and those outside the Church community).

This is especially true when churches make "unsubstantiated statements of an essentially secular nature destructive of a priest's character." *See Uzomechina v. Episcopal Diocese of N.J.*, 2024 U.S. Dist. LEXIS 9403, *18 (D.N.J. Jan. 18, 2024) (holding ministerial exception did not apply to defamation claims and was not intended to cast such a wide net) (citing *Hayden v. Shultze*, 701 So. 2d 1354, 1356-57 (La. Ct. App. 1997) (internal quotations omitted)). A court exercising jurisdiction over secular defamation claims does not threaten a church's ability to "investigate its clergy, find misconduct by a clergy member, or impose internal disciplinary measures against a member of the church. What it will threaten is a religious organizations' ability to make false and defamatory statements about its clergy or members to the general public outside of the organization's internal operations." *Id*. at *19.

Defendants' defamatory publication regarding Plaintiff's removal from fellowship was not conditionally privileged.  In addition to the "essentially secular nature" of the defamatory communication, Plaintiff has pled that Defendants abused any conditional privilege both through excessive publication, and by maliciously or recklessly communicating defamatory statements outside the interests of those included within the scope of any privilege.  See *Uzomechina at* *18. *See also Scott v. Bailey*, at *5-6.  The defamatory statement was not published as a part of UUA proceedings, but was widely circulated more than a month after the UUA removed Rohde from Fellowship. (ECF No. 1 at ¶ 128).  The statement was sent to thousands of congregations that the

30

UUA claims are "wholly independent" from the UUA.  (ECF No. 16 at 1; ECF No. 1 at ¶ 129.) Defendants assert that this independence extends to each congregation's ability to select their own ministers, from any religious denomination. (ECF No. 16 at 1). This independence brings the UU congregations "outside of the organization's internal operations" for purposes of a defamation claim. *Uzomechina* at *18. The UUA cannot assert that these "wholly independent" congregations for purposes of a contract claim are suddenly part of the UUA's internal operations and belong to the UUA for the purposes of conditional privilege on a defamation claim. (ECF No. 16 at 1, 11).  Such factual discrepancies make dismissal on the pleadings premature. *Barber*, 275 Pa. Super. at 418; see also Pa. R.C.P. 1030.

Even if a conditional privilege existed with respect to Defendants' notification to UU congregations that Plaintiff had been removed from fellowship, Plaintiff has pled that Defendants abused that privilege with the detailed and false defamatory communication. The defamatory statements in the letter go well beyond notification that Plaintiff had been removed from Fellowship. Defendants' defamatory letter went far beyond the normal notification process for removal from fellowship. (ECF No. 1 at ¶ 133). Defendants' statement was sent to thousands of congregations and "include[d] defamatory matter not reasonably believed to be necessary for the accomplishment of the purposes" of notifying the congregations that Plaintiff had been removed from fellowship. *See Manning*, 528 Fed. Appx. at 143. Instead of simply notifying the UU churches that the retired Rohde had been removed from fellowship, Defendants Lammert and the UUA knowingly and recklessly made false and defamatory statement that Rohde was responsible for "defaming colleagues" and that this determination was made after "extensive documentation, investigation and interviews." (ECF No. 1 at ¶¶ 134; 148.) Defendants do not have documentation of Rohde defaming her colleagues, nor did they perform an investigation

into the matter. (*Id*. at ¶ 148). In bad faith, Defendants made these statements in violation of the UUA's own policies and procedures at the time, which promised that "[a]ll information obtained through the investigation must be held in the strictest of confidence." (*Id*. at ¶ 137).

Plaintiff has pled abuse of the privilege by alleging that Defendants acted with malice or negligence. *Manning*, at 143. Defendants refused to review evidence demonstrating that Plaintiff had not defamed colleagues, then widely published a statement that she had defamed colleagues and that this was supported by "extensive documentation." (*Id.* at ¶¶ 148, 153.)  Defendants refused to ever investigate if she had actually defamed colleagues. (*Id*. 145; 148.) Defendants do not have "documentation," let alone "extensive documentation," that shows Plaintiff "defaming colleagues." (*Id*. at ¶ 148).

### 4)  Invasion of Privacy - False Light Claim

Pennsylvania has adopted the Restatement (Second) of Torts definition of false light invasion of privacy. See *Krajewski v. Gusoff*, 53 A.3d 793, 805-806 (2012) quoting Restatement (Second) of Torts § 652G*:*

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652G. Unlike the tort of defamation, false light allows for recovery on matters that are not provably false, but for those that, although true, are selectively publicized in a manner creating a false impression. See *Larsen v. Philadelphia Newspapers, Inc.* 543 A2d 1181, 1189 (Pa. Super. 1988). If the overall impression created by the publication was itself a "calculated falsehood" there is no constitutional protection for the statements. *Krajewski*, at 808-809, citing *Time, Inc. v. Hill*, 385 U.S. 374, 389-390 (1967). Also unlike the tort of

defamation, in Pennsylvania, there is "no caselaw showing that Pennsylvania has adopted a conditional privilege for false light invasion privacy claim[s], similar to the conditional privilege defense for defamation claim[s]…" *Casselli v. City of Phila*. 54 F. Supp. 3d 368, 378-79 (E.D. Pa. 2014).

Defendants knowingly created a "calculated falsehood" when they published the statement that "Based on extensive documentation, investigations, and interviews undertaken" Plaintiff was responsible for "defaming colleagues." (ECF No. 1 at ¶ 138.) Defendants created the impression with this statement that they had undertaken an actual investigation, and that documentation supported this allegation of defamation. This is false. (*Id*. at ¶ 139; 143-152.) Defendants placed Plaintiff in a false light, in that the public would think Plaintiff had spoken falsely about her colleagues and damaged their reputations and that Defendants had "extensive" documentation or investigations showing this to be the case. This is a "calculated falsehood" to harm and damage Plaintiff.

## V.   CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

> Respectfully submitted,
>
> KATHRYN J. ROHDE,
>
> By her attorney,
>
> /s/ Samantha K. Harris
> Samantha Harris
> ALLEN HARRIS PLLC
> P.O. Box 673
> Narberth, PA 19072
> 610-634-8258
> sharris@allenharrislaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent by first class mail, postage prepaid, to those indicated as non-registered participants on April 2, 2024.

/s/ *Samantha K. Harris*

Samantha K. Harris

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLANIA

KATHRYN J. ROHDE,

          PLAINTIFF,

      vs.

UNITARIAN UNIVERSALIST
ASSOCIATION, UNITARIAN
SERVICE PENSION SOCIETY, AND
SARAH LAMMERT,

         DEFENDANTS.

Civil Case No. 23-cv-05047

## **[PROPOSED] ORDER**

This Matter, having come before the Court on Defendants' Motion to Dismiss,

IT IS HEREBY ORDERED that Defendants' Motion is denied.

Entered this _____ day of _____, 2024

By: _____
Mitchell S. Goldberg
United States District Judge