UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHRYN J. ROHDE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 23-cv-05047 |
| | ) |
| UNITARIAN UNIVERSALIST ASSOCIATION, | ) |
| UNITARIAN SERVICE PENSION SOCIETY, | ) |
| and SARAH LAMMERT, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO MOTION TO DISMISS
(LEAVE TO FILE GRANTED BY COURT ON APRIL 24, 2024 (ECF No. 25))**

Defendants Unitarian Universalist Association ("UUA"), Unitarian Service Pension

Society ("USPS"), and Rev. Dr. Sarah Lammert hereby reply to Plaintiff's Response to

Defendants' Motion to Dismiss, and the documents appended to their supporting affidavits.[1]

**I.      This Court Can And Should Consider The Documents Attached To The Affidavits**

At the outset, regardless of whether the issues in this case are an affirmative defense

subject to Rule 12(b)(6) or jurisdictional under Rule 12(b)(1), this Court should consider the

McDonald and Bennett Affidavits and attached documents. Those documents are either

referenced in Rohde's Complaint or indisputably authentic, thereby available for the Court's

consideration without converting the matter to summary judgment. *See In re Burlington Coat*

*Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A]n exception to the general rule is

that a 'document integral to or explicitly relied upon in the complaint' may be considered

---

[1] As before, citations to affidavits are referenced by the affiant's initials and relevant paragraph or attachment number, e.g., "KR ¶ 3" cites to paragraph 3 of the Affidavit of Kathryn Rohde and "SBAtt. D" cites to Attachment D to the Affidavit of Rev. Dr. Sheldon W. Bennett.

'without converting the motion [to dismiss] into one for summary judgment.'"); *In re Rockefeller Center Properties, Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (court "may examine an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

In her Response, Rohde utterly fails to challenge the authenticity of any of the documents and/or the explicit, obvious relationship between the attached document and her claims. Hence, the Court may rely upon those documents and dismiss the Complaint. *See Roberts v. Inservco Ins. Servs., Inc.*, 334 F.Supp. 3d 646, 649 (E.D. Pa. 2018), *aff'd sub nom. Roberts v. Inservco Ins. Servs.*, 765 F.App'x 656 (3d Cir. 2019) ("The complaint must set forth 'direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory,' but a 'formulaic recitation' of the elements is insufficient." (footnotes omitted)).

## II.     Notwithstanding Rohde's Arguments, The First Amendment Precludes Her Claims.

Fundamentally, Rohde's Complaint challenges UUA's decision to terminate her Fellowship as a Unitarian Universalist ("UU") minister. That Fellowship status is a required condition for the initial and continued receipt of the USPS service gratuity as described in the "On Retirement: A Guide for UU Ministers and Partners" ("Retirement Guide") that Rohde specifically references in Complaint ¶ 123.[2] *See* SB ¶ 7; Atts. B and F at 7. As argued, that

---

[2] The referenced Retirement Guide states:  "Service gratuities are quarterly payments sent from the UUA to ministers **in fellowship** who have served at least 21 years in ministry, who have reached the age of 67, and *who have made application to the UUA Office of Church Staff Finances to receive these payments*. The money supporting this comes from the Unitarian Service Pension Society, a separate non-profit charitable organization incorporated in Massachusetts, and UUA trust funds designated for this purpose by donors decades ago. [language quoted in C ¶ 123] The average recipient receives about $400 each quarter. The range is from $320 to $600. Neither the individual ministers nor their congregations have made any financial contribution to the corpus that funds these payments. **The gratuities are not contractual obligations but are gifts made in appreciation for years of ministry served**…." (italics in original; emphasis in bold supplied).  *See* Retirement Guide at 9.

decision[3/] is beyond the jurisdiction of the secular courts.[4/] Nevertheless, in an effort to evade these realities, Rohde makes several arguments that are factually contradictory and without legal basis.

Despite describing her over thirty-year career as a UU minister in Fellowship with UUA, Rohde nevertheless attempts to claim that UUA is merely "a philosophical or political organization" and Unitarian Universalism is not a religion because it is not "theological" and lacks "doctrine."[5/] *See* Resp. at 17. That argument requires resolution of what UUs believe and is beyond this Court's subject matter jurisdiction.[6/] As a legal matter, contrary to Rohde's argument, it is also clear that the fact that a particular belief may also be the subject of political debate does not make it incompatible with a finding that such belief is religious. *See, e.g., Welsh v. U.S.*, 398 U.S. 333 (1970) (conscientious objection to war may be a religious belief).

Unitarians and Universalists have roots in 18th century American religious history and build upon religious beliefs dating back to the third and fourth centuries A.D. *See* Ahlstrom,

---

[3/] Within UUA, UUA and its Ministerial Fellowship Committee ("MFC") have the exclusive responsibility for conferring UU Fellowship status and may terminate that status for "unbecoming conduct, incompetence or other specified cause." Compl. ¶¶ 25-27.

[4/] This determination is based on Supreme Court cases analyzed in Defendants' Memorandum. *See Serbian Eastern Orthodox Diocese for the U.S. of America and Canada v. Milivojevich*, 426 U.S. 696, 713 (1976) ("[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization or ecclesiastical rule, custom or law."); *Watson v. Jones*, 80 U.S. 679 (1871) (secular courts have no role to play in reviewing ecclesiastical decisions rendered by tribunals created by voluntary religious associations); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 114-15 (1952) ("All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.").

[5/] This argument makes no sense. It would mean that Rohde was a minister of a political, not religious, group for which she seeks to continue to deliver sermons and perform religious functions such as weddings and funerals. *See e.g.* Compl. ¶¶ 118-19.

[6/] Accepting the truth of her Complaint allegations, Rohde challenges UUA's termination of her Fellowship based on her view that the reason for her Fellowship termination was inconsistent with its past practice when only sexual abusers were terminated. However, her own admission that Todd Ekloff also lost his Fellowship belies her argument. In addition, as fellowship terminations are a matter of public record, a list of those whose fellowship has been terminated and those who resigned with complaints pending is maintained on UUA's website at https://www.uua.org/uuagovernance/committees/mfc/clergy-misconduct-investigations.

Sydney, *A Religious History of the American People*, Yale Univ. Press (1972); McKanan, Dan, *A Documentary History of Unitarian Universalism*, Vols. I & II, Skinner House Books (2017). In addition, UUA is an association of over 1,000 UU congregations and affiliated communities united in their faith in a pluralistic living tradition which arises from the integrity of historical continuity and is inspired by a specific set of religious sources of wisdom, and by a coherent system of transcendent values, affirmations and purposes (approved by UUA's General Assembly), common forms and practices of worship and congregational life (such as the conduct of regular religious services), the credentialing of clergy and other religious leaders (including through ministerial fellowship), and a system of governance and institutions (polity) to preserve and advance them. *See* CMAtt. D at Articles I-III. Unitarian Universalism fully meets the Third Circuit's definition of a religion, as well as that of multiple government agencies. *See, e.g., Fallon v. Mercy Cath. Med. Ctr. of SE Pennsylvania*, 877 F.3d 487, 491 (3d Cir. 2017) ("a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters[,] is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching [and] often can be recognized by the presence of certain formal and external signs"); CMAtts. A-C.

This Cout should not entertain Rohde's baseless challenge to Unitarian Universalism and the UUA as it would be a profound invasion of the fundamental protections accorded by the First Amendment to UUA and the religious beliefs of hundreds of thousands Unitarian Universalists. The conclusion is inescapable that UUA's ecclesiastical decision and discipline process used to terminate Rohde's Fellowship, and its communication of the findings of the MFC, the highest level judicatory to which Rohde chose to take her claims,[7] to member congregations and

---

[7] Despite having the right to do so, Rohde did not appeal the MFC's decision to UUA's Board of Review. *See* CM ¶ 24.

Fellowshipped ministers as provided by the MFC's policy and uniform practice (CM ¶ 25) is beyond this Court's reach and review and must be dismissed without any further secular court review.

Dismissal under the well-established church autonomy doctrine is particularly appropriate as Rohde offers no facts to dispute that UUA is an association of UU congregations and that it made the decision to terminate her ministerial Fellowship. *See* n.3. That determination is not subject to the "ministerial exception" line of cases applicable to certain positions held by employees in religiously related entities under the Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012). Ministerial exception cases are factually distinguishable as they do not involve credentialling decisions made by an entity, like UUA, that has the exclusive right to determine whether an individual meets its requirements to speak on behalf of the religion. Moreover, ministerial exemption cases usually involve non-minister employees – for example, teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S.Ct. 2049 (2020) and a non-priest in *Petruska v. Gannon University*, 462 F.3d 294 (2006) – and inherently require an evaluation of the work responsibilities involved and whether, if at all, they involve religious duties and or other issues that do not involve unconstitutional entanglement with the religion's constitutionally protected right to determine for itself who will speak on its behalf.

For example, in *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113 (3d Cir. 2018), although it ultimately dismissed under the church autonomy doctrine, the court appropriately explored whether it could resolve the termination issues on neutral principles when there was evidence of a twenty-year employment contract with specific termination conditions. None of those facts exist here. Indeed, the only evidence of any "contract" here is Rohde's

Application for Fellowship in which she represents that she has read the MFC's Rules and agrees to abide by them and any amendments thereto. *See* CM Att. H. Further, the church autonomy doctrine protects UUA's right to determine whether Rohde's communications violated its requirements and constituted "defamation" under its, not the legal, definition of the term and to communicate that decision to its congregations and fellowshipped ministers. *See Hiles v. Episcopal Diocese of Massachusetts*, 437 Mass. 505, 513 (2002) ("The First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate the proceedings could be tested in civil court. (footnote omitted)"). The UUA and its MFC were not required to apply the legal definition of defamation.

This case is controlled by the *Milivojevich* Supreme Court decision as the determination to terminate Rohde's Fellowship – to defrock her – fundamentally involves UUA's right to determine "discipline, faith, internal organization or ecclesiastical rule, custom or law" protected by the First Amendment and involves subject matter jurisdiction that should be resolved on this Motion to Dismiss. *See Hiles,* 437 Mass. at 511 ("Once a court is called on to probe into a religious organization's discipline of its clergy, the First Amendment is implicated…When that occurs, principles of church autonomy deprive the court of subject matter jurisdiction." (citations omitted)). The case in its entirety should be dismissed.

## III. Notwithstanding Rohde's Arguments, The Court Lacks Personal Jurisdiction.

As Rohde acknowledges, personal jurisdiction in this case turns on her showing the third element of the *Calder v. Jones*, 465 U.S. 783 (1984), "effects test" – that Defendants "expressly aimed" their alleged tortious conduct at Pennsylvania such that Pennsylvania was the focal point thereof. *See Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007). Most clearly, Rohde has no answer for the cited, plainly analogous "email blast" cases, which uniformly hold that

untargeted, nationwide emails are not expressly aimed at any particular forum for personal jurisdiction purposes, even if the sender knew that some number of those emails would reach that forum.[8]

The 7th Circuit has rather famously explained why:

As a practical matter, email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant. The connection between the place where an email is opened and a lawsuit is entirely fortuitous.

*Advanced Tactical Ordnance Sys., LLC,* 751 F.3d at 803.

Rohde herself proves this point, relying in large part on *Gorman v. Shpetrik*, No. 20-4759, 2022 WL 717075, 2022 U.S. Dist. LEXIS 42389 (E.D. Pa. Mar. 10, 2022). In *Gorman*, this Court found the "expressly aimed" requirement was met based on allegations that the defendant, for the purpose of damaging the Pennsylvania-based plaintiff's personal reputation and business relationships, published a series of website and social media posts about the plaintiff's past sexual assault convictions and falsely accused him of pedophilia. 2022 WL 717075 at *1. The defendant then contacted the plaintiff in Pennsylvania by email three separate times in an attempt to blackmail him by threatening to publish even more disparaging information. *Id*. Following these failed blackmail attempts, the defendant saw his threats through, directing a tweet to plaintiff's Pennsylvania employee stating, "How does it feel working for person who was convicted of sexual assault on a minor?" and another message to the Pennsylvania-based CEO of a company affiliated with plaintiff's company calling the plaintiff a "child molester." *Id*. at *2. Given all these facts, the

---

[8] *See, e.g.*, *Advanced Tactical Ordinance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014), *as corrected* (May 12, 2014); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1200-01 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023); *Custom Dynamics, LLC v. Cyron, Inc.*, 2020 WL 3229297, at *4 (E.D.N.C. June 15, 2020); *Jagen Invs. LLC v. Cannon Fin. Inst., Inc.*, 2016 WL 11485896, at *6 (D. Nev. June 27, 2016), *rep. and rec. adopted*, 2018 WL 4335619 (D. Nev. Sept. 11, 2018).

Court quite easily concluded – in a few sentences – that the defendant's tortious conduct was "expressly aimed" at Pennsylvania such that it was the focal point of the tortious activity. *Id*. at *3.

This case, of course, is not like *Gorman* – Defendants did not initiate a series of website and social media posts for the purpose of disparaging Rohde, contact Rohde directly in Pennsylvania to blackmail her or for any other purpose, or direct personalized messages to Pennsylvania-based associates about her. There is simply no basis in fact or law for characterizing UUA's one-time, nationwide email blast as expressly aimed at Pennsylvania.

Perhaps sensing this conclusion, Rohde attempts to bolster Defendants' Pennsylvania contacts by additionally claiming that Defendant "Lammert held a private meeting with the leadership of the local congregation within the Eastern District of Pennsylvania where Plaintiff was minister emerita…." Resp. at 11. The implication – that Rev. Dr. Lammert traveled to Pennsylvania to conduct UUA business there – is, however, expressly refuted by Rohde's own affidavit, which acknowledges that this meeting was actually conducted remotely by Zoom. *See* KR ¶ 13. Participation in a single Zoom meeting with individuals in a particular forum will not establish, without more, minimum contacts in that forum.[9] The Court lacks personal jurisdiction.

---

[9] *See, e.g.*, *Bell Paper Box, Inc. v. Trans W. Polymers, Inc.*, 53 F.3d 920, 923 (8th Cir. 1995) (holding remote communications "cannot alone provide the minimum contacts required by due process"); *Grapevine Educ. LLC v. Educ. Ventures LLC*, No. CV-22-00991-PHX-SMB, 2022 WL 20739628, at *3 (D. Ariz. Nov. 1, 2022) ("Phone communication, payment sent to Arizona, email, and zoom communications are generally not enough."); *Axle Holding Co., LLC v. ARB Corp. Ltd.*, No. 22-CV-1472-MMA (JLB), 2023 WL 2415265, at *5 (S.D. Cal. Mar. 8, 2023) ("[T]he Court is not convinced [that telephone calls and Zoom meetings] supply the minimum contacts necessary for this Court to exercise specific personal jurisdiction, and Plaintiff points to no authority to the contrary.").

**IV.    Rohde Has Failed To State Viable Claims For Defamation, Invasion of Privacy, Breach of Contract, And Contract-Based Causes Of Action.**

    **A.    Defamation and Invasion of Privacy – False Light.**

Rohde fails to meaningfully address Defendants' main substantive argument against her defamation claim – that given the email's context, the speaker and audience, and UUA's rules, which indisputably require ministerial collegiality and respectful communication (*see* CM ¶ 16), the statement that Rohde "committed ministerial misconduct by defaming colleagues" is not itself capable of defamatory meaning. Indeed, Rohde altogether ignores the email's critically important next sentence, which states that Rohde "categorically denied the validity of any and all claims made, and the existence of harm or negative impacts stemming from her words or actions…." CMAtt. P.

This statement, which ensured that the email contained both UUA's and Rohde's version of events, not only enhances the email's non-defamatory context, but also defeats Rohde's false light claim. Invasion of privacy – false light claims hinge on a defendant's selective publication of only the worst parts of the story to make the plaintiff look bad. *See Miller v. Shubin*, Case No. 4:15-cv-1754, 2016 WL 2752675, at *8 (M.D. Pa. May 11, 2016). On its face, the email at issue was not a case of such a selective publication. In short, Rohde's defamation and false light claims fail.

    **B.    Breach of Contract for Fellowship Removal and Contract-Based Claims for Gratuity.**

All of Rohde's contract-based claims suffer from the same fatal shortcoming – nowhere does she identify any contract, or contract language, to which Defendants were bound but with which they failed to comply. Instead, Rohde only vaguely and repeatedly references some unstated "understanding" she had of the procedural protections allegedly due her under UUA

disciplinary rules and her alleged unrestricted entitlement to the USPS service gratuity. *See* Resp. at 20-25. Under longstanding Pennsylvania pleading rules, Rohde's contract-based claims fail for this reason alone. *See, e.g.*, 231 Pa. Code § 1019(i) ("When any claim or defense is based upon a writing, the pleader shall attach a copy of the writing, or the material part thereof, but if the writing or copy is not accessible to the pleader, it is sufficient so to state, together with the reason, and to set forth the substance of the writing."); *Giannone v. Giannone*, 429 F. Supp. 3d 34, 40 (E.D. Pa. 2019) (elements of breach of contract claim, including contract's essential terms and consideration supporting it, must be pled with specificity).

Rohde likewise has no explanation, because there is none, for how she could have contractual rights to the USPS service gratuity, when the founding Trust explicitly provides that no contracts be made. SB Att.B (USPS formed "for the purpose of providing annuities, but without making any contracts therefor…."). Indeed, the name "service gratuity" by definition precludes any such rights. In any event, as discussed, even the most cursory examination of the relevant documentation – which Rohde herself references and therefore incorporates into her pleadings – explicitly establishes that no such contract even arguably exists. *See* pp. 2-3 above and n.2. In sum, Rohde's contract claims are without merit and should be dismissed.

## V.   Conclusion.

For all of the foregoing reasons, and those outlined in Defendants' opening brief, the Court should dismiss the Complaint in full.

Respectfully submitted,

UNITARIAN UNIVERSALIST ASSOCIATION,
UNITARIAN SERVICE PENSION SOCIETY and
SARAH LAMMERT,

By their attorneys,

/s/ John M. Simon
Kay H. Hodge (*admitted pro hac vice*)
    khodge@scmllp.com
John M. Simon *(admitted motion pro hac)*
    jsimon@scmllp.com
Stoneman Chandler & Miller, LLP
99 High Street
Boston, MA 02110
(617) 542-6789

Chelsey R. List (331455)
Locke Lord LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY 10281
Telephone: 212-415-8600
Facsimile: 212-303-2754
Email: Chelsey.List@lockelord.com

Dated: April 24, 2024

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent by first class mail, postage prepaid, to those indicated as non-registered participants on April 24, 2024.

/s/ John M. Simon
John M. Simon